De Witt Wallace v. Commissioner. Lila Bell Wallace v. Commissioner.
Wallace v. Commissioner
Docket Nos. 1434, 1435.
United States Tax Court
1944 Tax Ct. Memo LEXIS 174; 3 T.C.M. (CCH) 718; T.C.M. (RIA) 44242; July 20, 1944
*174 John D. Garrison, Esq., for the petitioners. Thomas B. Charshee, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioners' income tax for the years 1938 and 1939 as follows: 1938
1939
De Witt Wallace
$11,092.60
$8,978.72
Lila Bell Wallace
9,033.65
7,266.47 The sole issue presented by the pleadings is whether respondent erred in including in petitioners' gross income for the taxable years the income of a certain trust carried by petitioners in 1935. The facts were stipulated by the parties. Findings of Fact We find the facts to be as stipulated and incorporate herein by reference the stipulation and exhibits attached thereto. They are substantially as follows: Petitioners are husband and wife residing at Mount Kisco, N. Y. They filed their income tax returns for the years 1938 and 1939 with the collector of internal revenue for the 14th district of New York. Petitioners are executives and stockholders of The Reader's Digest Association, Inc. At all times subsequent to December 27, 1935, they have been the record and beneficial owners of the entire authorized, issued and outstanding shares of common *175 stock of The Reader's Digest Association, Inc., with the exception of 250 shares, of which 125 shares were transferred by each of the petitioners on or about March 19, 1941, to two trusts (not here involved), one trust being created by each petitioner. Of the 5,000 shares of common stock De Witt originally owned 2,600 shares and Lila Bell Wallace originally owned 2,400 shares. The petitioners are two of the three duly qualified and acting directors of The Reader'sdigest Association, Inc. On December 27, 1935, the petitioners, De Witt and Lila Bell Wallace, created a trust known as The Wallace-Acheson Trust, to which they transferred 156 shares and 144 shares, respectively, of preferred stock of The Reader's Digest Association, Inc., the only other class of stock authorized and outstanding. These shares constituted the entire authorized, issued and outstanding preferred stock of The Reader's Digest Association, Inc. Under the provisions of the certificate of incorporation of The Reader's Digest Association, Inc., this preferred stock is without par value, has no voting privileges and is entitled to non-cumulative preferential dividends in each year, as and when declared by the board *176 of directors, up to $100 per share (and no more) before dividends may be declared and paid upon the common stock. The preferred stock is redeemable at the option of the board of directors in whole or in part at any time upon reasonable notice at $500 per share. Upon liquidation, the preferred stock is entitled to share equally up to $500 per share, and no more, with the common stock in the distribution or corporate assets remaining after the payment of all the corporate debts and the cormon stock is entitled to all assets remaining thereafter. The exclusive voting power is in the common stock. At all times subsequent to December 27, 1935, the value of the corporate assets has been far greater than the aggregate total of the debts and the liquidating value of the preferred stock of The Reader's Digest Association, Inc. This preferred stock has at all times remained in and constituted the entire corpus of the trust The five trustees named in the trust instrument consisted of the two grantors (the petitioners), Benjamin Bruce Wallace (a brother of De Witt Wallace), Barclay Acheson (a brother of Lila Bell Wallace) and Roy Compbell Abbott (an employee of The Reader's Digest Association, *177 Inc.) Mr. Abbott resigned as a trustee on March 15, 1941, and was succeeded by Pendleton Dudley, who is unrelated to either of the grantors and is not an employee of The Reader's Digest Association, Inc., but is an independent business promotion consultant and editorial adviser. Under the terms of the instrument governing the Wallace-Acheson trust, the trustees are to receive, hold, invest, and reinvest the trust estate, collect the income therefrom, and, during the term of the trust, are required to dispose of the income as follows: Pay the income to any one or more brothers, sisters, uncles, aunts, nephews, nieces, grandnerhews, or grandnieces of either or both of the petitioners, including those bearing such relationship to the grantors who are born after the execution of the trust instrument. Any income not distributed to the specified relatives is to be paid to Macalester College, St. Paul, Minnesota. The trustees are given absolute discretion in determining which relatives of petitioners shall receive distributions, how much each will receive for any particular period, and in changing from time to time the beneficiaries. The trust is to terminate upon the death of the survivor *178 of the petitioners, and may be terminated by the unanimous vote of the trustees during the lives of the petitioners or the life of the survivor of them. Upon the termination of the trust, if the petitioners or the survivor of them is the owner of 51 percent of the voting stock of The Reader's Digest Association, Inc., the trustees are to convey the principal of the trust to the officers and employees of The Reader's Digest Association, Inc., in amounts to be decided by unanimous vote. The amount to go to each employee or officer is limited to the salary and bonus of such employee or officer for the previous year. In determining amounts to go to officers and employees, the trustees are not entitled to make any allotment to an officer or employee who may be a trustee. The balance of trust corpus after distribution to officers and employees, or the entire corpus if the trust terminates without the petitioners or their survivor owning at least 51 percent of the voting stock of The Reader's Digest Association, Inc., is to be distributed to relatives of the petitioners or the survivor of them in a manner the details of which are not here material, but which, in general, contemplates distribution *179 to the petitioners' heirs and next of kin, or the survivor's heirs and next of kin. Any trustee other than the grantors may share in the distribution of the balance or of the entire principle if the requisite stock ownership is not in the petitioners at the time of termination of the trust. Upon the termination of the trust, the petitioners, the surviving petitioner, or the personal representative of the surviving petitioner, as the case may be, is to have the prior right to acquire any stock in The Reader's Digest Association, Inc. held by the trustees for the parvalue of the stock, if it has a par value, or lacking that, at its fair market price. The Reader's Digest Association, Inc. preferred stock transferred by the petitioners to the trustees is deemed to have a fair market value of $500 minus any liquidating dividends. The trustees are empowered to sell, mortgage, exchange, or lease all property held by them except that any sale, pledge or other disposition or encumbrance of the 300 shares of preferred stock of The Reader's Digest Association, Inc. constituting the original corpus of the trust may be made only with the written consent of the petitioners or the survivor of *180 them. No sale, investment or reinvestment may be made during the lifetime of the petitioners without their consent or the consent of the survivor of them. The trustees are empowered to hold any property or securities transferred to them without liability for any decrease in its value. The trust instrument further provides that in the event of any dispute between the trustees, the decision of the majority shall be binding except as otherwise specifically provided. The trust specifically provides that the petitioners are not entitled to receive any part of the income or principal of the trust, except by purchase of stock upon termination but trustees other than grantors are allowed to receive principal or income. The petitioners or the survivor of them are entitled to fill vacancies among the trustees. Any trustee can resign upon giving written notice to petitioners. The petitioners, in the trust instrument, reserved the right to increase the authority of the trustees but not the right to limit or decrease the powers. Petitioners have no children and none of the collateral beneficiaries in the trust instrument reside with the petitioners, and the petitioners are under no legal obligation *181 to support any of these relatives. From 1936 to 1943, inclusive, The Reader's Digest Association, Inc. has declared and paid the full dividend of $100 per share upon its preferred stock and such dividends, amounting to $30,000 per annum, constituted the entire annual income of the trust. The annual income of the trust has been paid in each of the years 1936 to 1943 in various amounts to the several beneficiaries. Each year during the existence of the trust the petitioners have proposed a plan of distribution of the trust income, including the specific amount paid each beneficiary in accordance with his financial need, and the other trustees have made no objection thereto. The income of the trust during 1936, 1938, 1939 and 1942 was distributed to the petitioners' relatives, as follows: Name
1936
1938
1939
1942
Barclay Acheson
$ 3,000.00
none
none
none
Louise F. Acheson
500.00
$ 500.00
none
none
Benjamin Wallace
1,250.00
1,250.00
none
none
Katherine Wallace
1,250.00
1,250.00
none
none
Marta May Barron
1,750.00
1,750.00
none
$ 1,800.00
Ralph Barron
750.00
750.00
none
1,800.00
Bess Tollefson
750.00
750.00
$ 2,400.00
none
Lou Tollefson
1,350.00
2,750.00
2,400.00
1,800.00
Ted Tollefson
100.00
100.00
100.00
400.00
Barclay Tollefson
100.00
100.00
100.00
none
Evangeline Rowe
750.00
750.00
none
1,800.00
Trendall Rowe
750.00
750.00
none
1,800.00
Mattie Wallace
900.00
1,200.00
1,200.00
1,500.00
Gordon Davies
652.50
791.50
none
none
Wallace Davies
653.00
none
none
none
Judy Acheson
2,000.00
1,600.00
none
none
Helen Davies
900.00
1,995.83
2,500.00
1,950.00
John Davies
900.00
1,895.82
2,500.00
1,950.00
Miriam Scanola
1,650.00
2,183.33
2,400.00
2,450.00
Michael Scanlon
1,500.00
2,383.52
2,400.00
700.00
Nina Wallace
2,450.00
1,200.00
2,400.00
1,800.00
Robert Wallace
2,450.00
1,200.00
2,400.00
1,800.00
Alice Davis
900.00
900.00
900.00
750.00
Elizabeth Davis
900.00
900.00
900.00
750.00
John P. Davis
600.00
900.00
900.00
750.00
Ruth Ann Wallace
1,054.50
1,850.00
190.00
none
James J. Wallace
190.00
none
50.00
none
Robert Davies
none
300.00
none
none
Evelyn Wallace
none
none
50.00
none
Jane Tollefson
none
none
none
1,800.00 lMary Helen Scanlon
none
none
none
1,950.00
Miriam P. Scanlon, Jr.
none
none
none
1,115.00
$30,000.00
$30,000.00
$23,790.00
$28,665.00
*182 All the beneficiaries of the trust income who received distributions are relatives of the petitioners within the classification set up by the trust agreement. Barclay Acheson, one of the trustees, was one beneficiary receiving distributions, as was his wife Louise P. Acheson. Barclay Acheson's daughter, Judy Acheson (married name Judy Thompson) and her husband Fred Thompson also received distributions of trust income. Distributions of income were also made to Benjamin Bruce Wallace, one of the trustees, and to his wife Catherine Wallace. Gift tax returns covering the transfer of 300 shares of preferred stock of The Reader's Digest Association, Inc. were duly filed by the petitioners and gift taxes were paid. In each of the years 1936 to 1942, inclusive, fiduciary income tax returns have been filed for the trust showing the receipt and distribution of income for each of said years in the amount of $30,000. Opinion KERN, Judge: It is shown by respondent's determinations of deficiencies herein that the net income of petitioner De Witt Wallace disclosed by his returns for 1938 and 1939 amounted to $262,733 and $286,011, respectively; and the net income of petitioner Lila Bell Wallace *183 disclosed by her returs for these years amounted to $229,496 and $254,816. We may infer from these figures that each petitioner had income in excess of normal needs. Petitioners had no children but had many collateral relatives, ranging in kinship from brothers and sisters to grandnephews and grandnieces. To these they wished to give amounts of money from year to year in varying amounts. They were the owners of a highly profitable publishing concern known as The Reader's Digest Association, Inc., of which they owned practically all the voting common stock and all the authorized preferred stock represented by 300 shares of no par value, upon which dividends were payable annually in the sum of $30,000. Petitioners created a trust, the corpus of which was the preferred stock mentioned above. The trustees were five in number and consisted of the two petitioners, a brother of petitioner De Witt Wallace, a brother of petitioner Lila Bell Wallace, and a business associate of petitioners. The primary beneficiaries of the trust were the relatives of petitioners or a college, and the income of the trust was to be paid to them "in such amounts as to each and at such times as the Trustees in *184 their absolute and unrestricted discretion select and decide * * *". The trust was to continue during the lives of petitioners but could be terminated by the unanimous vote of the trustees at any time. If terminated during the lives of petitioners they could acquire the preferred stock held by the trust at its par value, if it had a par value, and if not, at a price of $500 a share. During the lives of the grantors no part of the corpus of the trust could be sold and no investments could be made by the trustees without the consent and approval of petitioners. During all of the years of the trust's existence, the recommendations of the petitioners with regard to which of the petitioners' relatives should receive the income of the trust and in what amounts have been followed by the other trustees who "made no objection thereto." During some of those years the brothers of petitioners who were trustees received, or members of their immediate families received, a part of the trust income. All of the net trust income for the years 1936 to 1943 inclusive, was distributed in varying amounts to petitioners' relatives except that in 1943 (the year in which the deficiency was determined) $2,000 *185 was given to Macalester College. The situation which we have just outlined may be summed up in this way: Petitioners wished to make periodic gifts to the [memberss] of their several families. If they retained the property producing the gifts their incomes would not be diminished for tax purposes. They chose to make the gifts not by outright transfers, but by the indirect method of a complicated discretionary trust. The problem which we must decide is whether they retained such powers over the income and the corpus of the trust as to make them taxable on its income under the doctrine of , and related cases. The first question which occurs in a consideration of this case is whether the three persons who served with petitioners as trustees are to be regarded as independent or were subservient as to discretionary matters to petitioners' wishes. We can not, with any sense of reality, consider these three persons chosen by petitioners to act with them as trustees as independent. One of them is simply described in the stipulation of facts as "not an employee of The Reader's Digest Association, Inc., but * * * an independent *186 business promotion consultant and editorial adviser." The natural construction of this language in the light of the other facts, is that this person is not a salaried employee but carries on his own business of consulting with publishers including petitioners as to their promotion problems and advising them as to editorial matters. Therefore, we are justified in regarding him as a business associate of petitioners who would respect the wishes of petitioners in the exercise of the discretionary powers given to the trustees over the selection of those relatives of petitioners to whom the trust income was to be disbursed, the administration of the corpus given by petitioners to the trust and the termination of the trust during petitioners' lives. We do not mean by this that he would violate the laws of New York in order to be agreeable to petitioners, but that in purely discretionary matters he would conform to their wishes. Each of the other two trustees was a brother of one of the petitioners. During several of the years of the trust's existence either the brothers or their wives or children received allotments of the trust's (thus indirectly the petitioners') bounty. The petitioners *187 were childless and wealthy and had no closer relatives. We can not avoid the conclusion that under these circumstances the two brothers would accede to the lawful wishes of petitioners concerning the administration and termination of the trust. It is noteworthy that all of the trustees have followed the suggestions of the petitioners relating to the administration of the trust without objection. As the Circuit Court of Appeals for the Second Circuit said of a somewhat similar case in : "Though lacking in legal powers to control his [the trustee's] discretion, there is little doubt that she [the settlor] could have her way in directing the disposition of income between the possible beneficiaries." We, therefore, conclude that, in reality, the petitioners were in control as to all discretionary matters in connection with the trust including the disposition of income between the possible beneficiaries and the termination of the trust. The petitioners as settlors reserved to themselves broad powers over the management of the trust corpus. The preferred stock given to the trust could not be sold without their *188 consent and during their lives no investments or reinvestments could be made without their consent and approval. This trust can not be examined fairly without looking at it in the perspective of the entire picture which includes the relationship of petitioners to The Reader's Digest Association, Inc., whose preferred stock forms the corpus of the trust. Upon termination of the trust the petitioners could repurchase this stock at either its par value or at $500 a share which, to quote from the trust instrument, shall be deemed its fair market value "for all purposes under this agreement, except in the event of the sale of such stock by the Trustees to others than the Grantors or the survivor of them." In the case of a sale to such others it is obvious that the sale price would be considerably in excess of $500 since it was entitled to preferential dividends each year up to $100 per share. While the preferred stock had no par value at the time it was given to the trust the corporation which issued it might place a par value upon it, not necessarily an arbitrarily low or nominal par value, but one which would insure to petitioners a bargain if they should reacquire this stock upon termination *189 of the trust. And the petitioners controlled the issuing corporation. Thus, while petitioners did not retain a reversion in the property which they transferred to the trust, they did retain, in effect, the right to reacquire the property at bargain prices. It is by now axiomatic that the decision of cases such as this which call for the application of the doctrine of the Clifford case must rest upon their own facts. In this case we consider that the petitioners retained such powers over the income and the corpus of the trust in question as to require the inclusion of the income therefrom in petitioner's gross income. See . Petitioners stress the fact that the beneficiaries, or potential beneficiaries, of the trust were not members of the petitioners' immediate family or of an intimate family group, and petitioners owed to none a legal duty of support. This is doubtless a proper factor for us to consider in a case involving the Clifford doctrine, but it is not controlling. The potential beneficiaries of this trust embraced all of petitioners' living relatives from the second degree of consanguinity to *190 the fourth. Petitioners had no other immediate family or more intimate family group. Petitioners were wealthy and childless. They felt such an obligation of kinship to assist their less wealthy brothers and sisters, and their families, as to warrant the creation of the elaborate trust before us. Under the facts of the instant case we conclude that petitioners' contention on this point is without merit. On the issue presented we decide in favor of respondent. Decision will be entered under Rule 50.